UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| SYLVESTER JAMES MAHONE<br><br>Plaintiff,<br><br>v.<br><br>DOUG WADDINGTON, *et al.*,<br><br>Defendants. | Case No. C04-5463RJB<br><br>REPORT AND RECOMMENDATION<br><br>**NOTED FOR:**<br>**August 5th, 2005** |

This Civil Rights action has been referred to the undersigned Magistrate Judge pursuant to Title 28 U.S.C. § 636(b)(1)(B). Before the court is defendant's motion for summary judgement. (Dkt. # 56). Defendant's motion was filed one day before the cut off date for dispositive motions. The cut of date set by the court was March 19th, 2005.

On April 22nd, 2005 the court received a 48 page response from plaintiff and a 14 page cross motion along with a motion to file an over length brief. (Dkt. # 63, 66, and 67). Attached to the response and the cross motion were 183 pages of exhibits. The court declined to consider plaintiff's filings as the filings violated local rules regarding length and were untimely to the extent that plaintiff sought to file a cross motion for summary judgment which is a dispositive motion. Plaintiff was

REPORT AND RECOMMENDATION - 1

given thirty days to file a response that complied with local rules as to length and the action was stayed. (Dkt. # 91).  During the stay plaintiff filed a motion for counsel that the court declined to hear.  On June 14th, 2005 plaintiff filed a response to the motion for summary judgment that complies with the local rules regarding length, however, plaintiff has incorporated sections from his original response by simply turning the sections of that pleading into exhibits.  To the extent that the exhibits contain additional argument they will not be considered.  To the extent the exhibits references another exhibit and acts as a directory to another exhibit the briefing has been considered.

Plaintiff's referencing his former brief means in some cases one brief references another brief which references a declaration which references an exhibit with attachments. This has made tracking and following plaintiff's argument extremely difficult. The court has attempted to follow plaintiff's arguments to the best of its abilities.

## FACTS

A.   <u>Facts relating to the handling of legal mail</u>.

Plaintiff's first allegation is that prison staff opened and read his mail on four separate occasions.  He also alleges one piece of incoming legal mail was "lost." There is a Department of Corrections policy in place that prohibits the opening of clearly marked legal mail outside the presence of the inmate. (Dkt. # 56, page 3).

The first incident occurred June 4th, 2003.  Defendants allege this piece of mail may have been erroneously routed through the mail room as regular mail and was opened by mistake. (Dkt. # 56 , page 3).  The response to a grievance filed by plaintiff indicates that the Custody Unit Supervisor "reiterated expectations" regarding the handling of legal material to his staff.

Approximately six weeks later on July 18th, 2003 a second piece of legal mail was delivered to plaintiff opened.  In response to plaintiff's grievance the department indicates several unit supervisors were alerted to the problem and staff was again informed that the expectation is that legal mail will be opened in the presence of the inmate. (Dkt. # 56, page 3).

Six months later on January 5th, 2004 correctional officer Sullivan, who is a named defendant in this action, delivered a piece of legal mail to plaintiff that had been opened and re sealed using

REPORT AND RECOMMENDATION - 2

tape. Defendants contend the this piece of mail was fed into a mail opening machine by mistake and before staff realized it was legal mail. Defendants contend the mail was not read. (Dkt. # 56, page 3). None of the mail was clearly identified as to its source, although there appears to be no contention the mail was not legal mail.

On March 15th, 2004 plaintiff complained that correctional officer Ingram brought him an open piece of legal mail. Defendants contend the officer opened this piece of mail while standing at the front of Mr. Mahone's cell and after announcing he had legal mail for Mahone. Again the mail was not read. Mr. Mahone alleges he did not see the officer open the mail and he refused to accept it.

Defendants have shown that plaintiff has no evidence to prove any of his legal mail was read by prison staff and his allegation is based solely on speculation. (Dkt. # 56, exhibit 3 deposition of plaintiff). Further, plaintiff admits that usually his legal mail is brought to him unopened and the four incidents mentioned in the complaint are the only times his mail was not properly handled. Finally, plaintiff concedes that none of his litigation was harmed by the four incidents mentioned in the complaint. (Dkt. # 56, page 4).

With regard to the missing or "lost" piece of legal mail defendants have shown that plaintiff never filed any grievance regarding this alleged incident in the prison grievance system. Further, Mr. Mahone refused to cooperate with the investigation regarding the July 18th, 2003 incident. (Dkt. # 56, page 11 and 12).

Plaintiff contests defendants assertions that he has not exhausted available remedies. With regard to the lost piece of mail he filed a tort claim with the state, but he concedes he never filed a prison grievance. Plaintiff indicates he had missed the time lines for filing such a grievance. (Dkt. # 97, Attachment I, Appendix A, (declaration of Mahone page 5 and 6)). Further, plaintiff's own declaration shows that he did not complete the process regarding the July 18th, 2003 incident. (Dkt. # 97, Attachment I, Appendix A, (declaration of Mahone page 5 and 6)). Plaintiff refused to be interviewed in the normal manner as other inmates and his request for special procedures was denied. (Dkt. # 97, Attachment I, Appendix A, (declaration of Mahone page 5 ¶ 13)). The record plaintiff

REPORT AND RECOMMENDATION - 3

places before the court shows that when the Custody Unit Supervisor tried to interview plaintiff he made himself unavailable once by using the toilet and once by refusing to participate in the investigation because he would not agree to being taken to an interview room in handcuffs and shackles. (Dkt. # 97, Attachment I, Appendix A, (declaration of Mahone)).

With regard to the June 4th, 2003 incident plaintiff's exhibits correspond with defendants assertions. (Dkt. # 97 Attachment I, Appendix C, Exhibit 1). The three pages of this exhibit show the grievance was exhausted. Prison officials indicated that although the incident was unconfirmed staff were reminded of what proper procedures were. (Dkt. # 97 Attachment I, Appendix C, Exhibit 1, (grievance log id # 0312448 level I., II, and III responses)).

With regard to the January 5th, 2004 incident plaintiff's exhibits again track with defendants assertions. (Dkt. # 97 Attachment I, Appendix C, Exhibit 1(a)). Mr. Mahone was informed this piece of mail was inadvertently placed into a mail opening machine but was not read, the mail was re-sealed and delivered.(Dkt. # 97 Attachment I, Appendix C, Exhibit 1(a), (grievance number 0401315)).

The final incident regarding legal mail occurred March 15th, 2004 the grievance response shows Officer Ingram announced his presence and while standing at Mr. Mahone's cell front he then opened the legal mail. Mr. Mahone was apparently not watching and then refused to accept the mail. (Dkt. # 97 Attachment I, Appendix C, Exhibit 3, (grievance number 0406158)). There is absolutely no evidence to show Officer Ingram or any other prison official read this mail.

  B. <u>Facts relating to medical treatment</u>.

    1. <u>Medical emergency</u>.

On January 1st, 2004, while plaintiff was housed in the Intensive Management Unit, there was an altercation involving another inmate. The other inmate was being housed three doors down from plaintiff and became suicidal. The inmate was cutting his wrists with a piece of plastic he had broken off a radio in his cell. (Dkt. # 97 Attachment II, Exhibit 1). The inmate also attempted to choke himself with the radio cord. Pepper spray was deployed to help subdue this inmate. (Dkt. # 97 Attachment II, Exhibit 1). Plaintiff alleges he was subjected to the vapors by second hand

REPORT AND RECOMMENDATION - 4

exposure. It is uncontested that prior to use of pepper spray plaintiff informed defendant Thaut he was allegedly allergic to pepper spray. (Dkt. # 56). Defendant Thaut alleges he checked with medical personnel with medical personnel and was informed plaintiff was not allergic to pepper spray. (Dkt. # 56, Exhibit 4). Plaintiff has not contested this assertion in any way.

Pepper Spray was deployed and plaintiff alleges he subsequently declared a medical emergency to defendant Thaut. (Dkt. # 97). Defendant Thaut, in his affidavit in support of summary judgment denies plaintiff declared a medical emergency. (Dkt. # 56, Exhibit 4, (affidavit of Thaut)). Other evidence disputes defendant Thaut's assertion (Dkt. # 97 Attachment II Appendix E, Second Exhibit numbered 1, (Second set of interrogatories to defendant Thaut, interrogatory 3)). This interrogatory states:

> Please "STATE" in full all the actions Defendant Thaut took when Mahone declared a medical emergency on January 1st, 2004, on the third shift, in the I-M-U."
> RESPONSE: "I notified the medical department, through the IMU Booth Officers, that he was declaring a medical emergency.

(Dkt. # 97 Attachment II Appendix E, Second Exhibit numbered 1, (Second set of interrogatories to defendant Thaut, interrogatory 3)); See also affidavit of inmate McCallister indicating plaintiff did declare a medical emergency on January 1st, 2004. (Dkt. # 97, Attachment II, Appendix D, Exhibit 3).

Plaintiff alleges he was coughing, vomiting, and was vomiting blood. The records submitted by both parties disclose that plaintiff suffers from a stomach condition and often vomits or regurgitates food. (Dkt. # 97 Attachment II, Appendix E, Exhibit 3). Indeed plaintiff himself stated on January 11th, 2004 "I need to get checked for my Hiertal [sic] Herniated [sic] which may be giving me Giastro [sic] Esophageal Reflux Disease. I often regurgitate my foods and it irritates my esophagus. I signed up for sick call several months ago and complained of this Herniated Hierta [sic] but PA Johnson dismissed it as just my stomach muscles crunching together when I vomit or cough that causes the stomach pain." (Dkt. # 97 Attachment II, Appendix E, Exhibit 3).

    2.    <u>Medical Treatment</u>.

The first written evidence of plaintiff requesting medical treatment after the January 1st, 2004

REPORT AND RECOMMENDATION - 5

use of pepper spray was made on January 4th, 2004. Plaintiff requested a re-fill of a throat lozenge prescription and complained that pepper spray mist got into his cell. He complained he coughed up blood and his esophagus was sore. Plaintiff did not ask to be seen by medical personnel and specifically states "If I need sick call for this issue fine." (Dkt. # 97, Attachment I, Appendix E, Exhibit 1). Medical staff did not consider plaintiff's condition serious as he was not seen until January 13th, 2004. Id.

Plaintiff's second written request to medical is dated January 7th, 2004. Plaintiff does not request any treatment and does not indicate he is in any pain or danger. Instead he asks a hypothetical question "Can you tell me if I were to declare a medical emergency due to coughing up blood an I supposed to see a nurse?" (Dkt. # 97, Attachment I, Appendix E, Exhibit 2). Medical personnel responded by seeing plaintiff on January 13th, 2004. Id.

On January 11th, 2004 plaintiff made his first written request to see medical personnel. He was seen two days later. (Dkt. # 97, Attachment I, Appendix E, Exhibit 3). Interestingly, in this request plaintiff makes no mention of the January 1st pepper spray incident and instead indicates he has a "Hieital [sic] Hernia". Plaintiff indicates he often regurgitates food and has an irritated esophagus. He also indicates he vomits or coughs causing stomach pain. (Dkt. # 97, Attachment I, Appendix E, Exhibit 3). Plaintiff was seen by PA Figueroa two days later.

One day after being seen by PA Figueroa, on January 14th, 2004 plaintiff filed a request asking what two medications did. He also asks what would caused side effects with those medications. He also asked to have it placed in his file that he was allergic to pepper spray "due to the pepper spray mist exasperating my hiatel [sic] hernia, causing me to cough and vomit food and blood thus causing extreme pain." (Dkt. # 97, Attachment I, Appendix E, Exhibit 4). He also asks that a scope be put down his throat to check the condition of his alleged hernia. (Dkt. # 97, Attachment I, Appendix E, Exhibit 4). The response was made on January 16th, 2004 and PA Figueroa answered his questions telling him about the medications and where to get more information about the medications. PA Figueroa also told him it was not medically indicated he was allergic to pepper spray and it was not yet necessary to scope his throat. (Dkt. # 97, Attachment I,

REPORT AND RECOMMENDATION - 6

1  Appendix E, Exhibit 4).

2      On January 28th, 2004 plaintiff made a request to see a doctor for his alleged hernia.  (Dkt. #
3  97, Attachment I, Appendix E, Exhibit 5).  His request was noted February 2nd, 2004.  February 3rd
4  plaintiff made another request to see a doctor regarding his alleged hernia indicating he was coughing
5  up blood.  (Dkt. # 97, Attachment I, Appendix E, Exhibit 6).  Plaintiff was seen two days later by PA
6  Figueroa.  (Dkt. # 97, Attachment I, Appendix E, Exhibit 6).  During the same time period in
7  January refused to have his blood drawn for lab work.  (Dkt. # 97, Attachment I, Appendix E,
8  Exhibit 1 and 7).

9      In March of 2004 plaintiff filed a grievance in which he indicates he declared a medical
10 emergency on January 1st, 2004.  Plaintiff alleges his request was denied.  This is the first written
11 indication where plaintiff alleges he declared an emergency.  Plaintiff indicates that on January 1st,
12 2004 he vomited blood and was in pain but he does not indicate the symptoms are on going. Plaintiff
13 asks to be seen by a Doctor.  The response informs plaintiff he has been seen repeatedly by PA
14 Figueroa and the PA makes the determination if a patient sees a doctor.  Hand written over this
15 response is the note "App. On 4-11-04."  (Dkt. # 97, Attachment I, Appendix E, Exhibit 8).
16 Plaintiff's exhibit docket number 97, Attachment I, Appendix E, Exhibit 9 is folded and illegible.
17 This document has not been considered by the court.

18     On March 10th, 2004 plaintiff was seen by Doctor Khurshid.  Doctor Khurshid dictated his
19 examination assessment.  (Dkt. # 97, Attachment I, Appendix E, Exhibit 10).   The Doctor noted
20 plaintiff to be "focused on having a hernia" and on having symptoms secondary to exposure to
21 pepper spray.  The doctor indicates plaintiff only describes the one incident of vomiting blood on
22 January 1st, 2004.  (Dkt. # 97, Attachment I, Appendix E, Exhibit 10).  Further, plaintiff denied
23 having regular nausea or vomiting.  (Dkt. # 97, Attachment I, Appendix E, Exhibit 10).  Doctor
24 Khurshid states plaintiff was worried about the violent coughing and dry heaves he allegedly
25 experienced in January of 2004 and wanted to know why it happened  "and never before since he has
26 been exposed to pepper spray previously in the past."

27     In the assessment area Doctor Khurshid indicates:

28 REPORT AND RECOMMENDATION - 7

> GERD; patient is focused on having hiatal hernia and having symptoms secondary to exposure to pepper spray and wants an EGD done. Does not have any hematomesis[sic] or melena and does not have any family history of cancers, does not have any weight loss. Does not have regular nausea or vomiting. Patient was argumentative about getting an EGD or asking me why he had bloody vomiting at that point in time when he was exposed to pepper spray. I told the patient that secondary exposure to an irritant he probably had some cough as well as dry heave. There is no documentation of bloody vomiting but patient states that he did declare medical emergency but custody never allowed him to have that. I told patient usually medical emergencies are brought to medical and are evaluated. Patient was asking specific questions whether I do have cancer or ulcer or hiatal hernia or not. I told the patient there is no definite proof that he did not have that but his signs, symptoms and history does not point to any of those. He might have a small hiatal hernia which is not the cause of these symptoms and I told the patient that most probably was secondary exposure to pepper spray which is an irritant and the patient should try to cover his face with some clothes if possible if he gets exposed to the irritant again but there is no medical indication for giving him a specific HSR for allergic to pepper spray because this is not an allergy this in an inflammatory response that any one who would be exposed to pepper spray would have. I did tell him that an EGD is not indicated at this point but I will go ahead and schedule a barium swallow to make sure that patient does not have any ulcers and to see how big his hiatal hernia is. If indicated we will do an EGD but I do not think this is necessary at this point, otherwise patient will be seen on sick call on a p.r.n. basis.

(Dkt. # 97, Attachment I, Appendix E, Exhibit 10).

    C.    CONDITIONS OF CONFINEMENT.

Plaintiff challenges the 24 hour lighting level maintained in the IMU, and the fact that the unit has translucent windows that do not allow for outside viewing. He claims, without proof, that lighting levels have given him physiological problems and damaged his eyesight.

### DISCUSSION

    A.    The standard of review.

Pursuant to Fed. R. Civ. P. 56 (C), the court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (C). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim on which the nonmoving party has the burden of proof. Celotex corp. v. Catrett, 477 U.S. 317, 323 (1985).

There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a

REPORT AND RECOMMENDATION - 8

1  rational trier of fact to find for the nonmoving party.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio
2  Corp.</u>, 475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant probative
3  evidence, not simply "some metaphysical doubt."). <u>See also</u> Fed. R. Civ. P. 56 (e).  Conversely, a
4  genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed
5  factual dispute, requiring a judge or jury to resolve the differing versions of the truth.  <u>Anderson v.
6  Liberty Lobby, Inc.</u>, 477 U.S. 242, 253 (1986); <u>T. W. Elec. Service Inc. v. Pacific Electrical
7  Contractors Association</u>, 809 F.2d 626, 630 (9th Cir. 1987).

8    The determination of the existence of a material fact is often a close question.  The court
9  must consider the substantive evidentiary burden that the nonmoving party must meet at trial, e.g. the
10 preponderance of the evidence in most civil cases.  <u>Anderson</u>, 477 U.S. at 254; <u>T.W. Elec. Service
11 Inc.</u>, 809 F.2d at 630.  The court must resolve any factual dispute or controversy in favor of the
12 nonmoving party only when the facts specifically attested by the party contradicts facts specifically
13 attested by the moving party. <u>Id</u>.

14   The nonmoving party may not merely state that it will discredit the moving party's evidence
15 at trial, in hopes that evidence can be developed at trial to support the claim.  <u>T.W. Elec. Service
16 Inc.</u>, 809 F.2d at 630.(relying on <u>Anderson</u>, *supra*).  Conclusory, nonspecific statements in affidavits
17 are not sufficient, and "missing facts" will not be "presumed."  <u>Lujan v. National Wildlife
18 Federation</u>, 497 U.S. 871, 888-89 (1990).

19   B. <u>Exhaustion of available remedies</u>.
20 The Prison Litigation Reform Act (PLRA) requires:
21-23  The court shall on its own motion or on the motion of a party dismiss any action brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility if the court is satisfied that the action is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief.

24 42 U.S.C. § 1997e(c)(1).

25   An inmate may not file a lawsuit until he exhausts administrative remedies. <u>Rumbles v. Hill</u>, 182
26 F.3d 1064, 1066 (9th Cir. 1999), cert. denied, 528 U.S. 1074 (2000); <u>Booth v. Churner</u>, 532 U.S. 731,
27 732-41 (2001).  Exhaustion under 42 U.S.C. § 1997e(a) is not simply optional, it is mandatory.  <u>Porter v.
28 REPORT AND RECOMMENDATION - 9

1  Nussle, 534 U.S. 516, 524 (2002).  There is no requirement that the grievance system be easy to exhaust
2  or that grievances be handled in a specific time frame.  Thus, plaintiff's argument regarding the manner
3  in which his grievances were handled does not relieve him from the obligation to exhaust and follow the
4  rules of the system the state has put in place.

5        It is clear plaintiff did not exhaust all the issues in his complaint.  No prison grievance was ever
6  filed regarding the "lost" legal mail incident.  Further, the grievance regarding the July 18th, 2003
7  incident was administratively withdrawn when plaintiff refused to cooperate with prison officials.
8  Neither of these issues should be considered and both should be dismissed for failure to exhaust
9  administrative remedies.

10       The next issue is wether the entire action should be dismissed.  The premise behind requiring
11 exhaustion is that the number of suits ultimately filed will be smaller and the quality of the suits that
12 remain will be better.  Mandating exhaustion of administrative remedies also gives corrections officials
13 an opportunity to address complaints internally.  This may lead to corrective action in response to an
14 inmate's grievance and might improve prison administration and satisfy the inmate.    Defendants argue
15 exhaustion applies with special force if  "'frequent and deliberate flouting of administrative processes'
16 could weaken an agency's effectiveness by encouraging disregard of its procedures". (Dkt. # 56,  page
17 11 citing McKart v. United States, 395 U.S. 185, 195 (1969)). Defendants argue that the special force
18 argument also applies to prisons and states "The Supreme Court has recognized that courts have a limited
19 role in reviewing the difficult and complex task of modern prison administration. Thornburgh v. Abbott,
20 490 U.S. 401, 407 (1989) (quoting Turner v. Safley, 482 U.S. 78, 85 (1987))."   The court in Turner
21 held:

> Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a . . . responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint.

Turner v. Safley, 482 U.S. at 84-85.

Defendants argument is persuasive given that the grievances here involved allegations of staff

REPORT AND RECOMMENDATION - 10

misconduct and policy issues which are items a grievance would bring to prison officials attention. Further, defendants note that two circuits have issued written opinions indicating dismissal of the entire action is the remedy and there is at least one district court in the Ninth Circuit that has agreed. (Dkt. # 56, page 12).

The other side of this issue is the fact that plaintiff has claims in this action that are exhausted that are totally unrelated to the mail claims. Dismissal would only mean these other claims could be brought in a new action and plaintiff would be burdened with another filing fee.

The court concludes the most equitable solution is to refuse to consider the mail claims that were not exhausted and consider the remaining claims. This gives full effect to the purpose of exhaustion while allowing exhausted claims to go forward.

C.   Exhausted mail issues.

The three remaining claims are the June 4th, 2003 incident, the January 5th, 2004 incident and the March 15th, 2004 incident.

At the outset the court should dismiss any claim regarding the March 15th, 2004 incident. Officer Ingram states he was cell front and announced he was there with plaintiff's legal mail. Plaintiff claims he did not witness the opening of the mail and he therefore refused to accept it. Plaintiff has no evidence to show this mail was read, no evidence to show any injury to any action, and officer Ingram arguably followed existing policy. The United States Constitution does not force plaintiff to view the opening of his legal mail. Opening and inspection of the legal mail in the inmates presence is sufficient.

Prison inmates have a First Amendment right to send and receive mail. Pell v. Procunier, 417 U.S. 817, 822 (1974). A prison may limit an inmate's constitutional rights if the restrictions are reasonably related to legitimate penological interests. Turner v. Safely, 482 U.S. 78, 89 (1987). The extent of a prisoner's rights with regard to the inspection of legal mail is uncertain. Wolff v. McDonald, 418 U.S. 539, 577 (1974). A prison policy of opening legal mail for inspection only in the presence of the inmate meets, and may even exceed, the demands of the Constitution. Id.

With regard to the other two incidents, inadvertent opening of a prisoner's legal mail at most amounts to negligence. Stevenson v. Koskey, 877 F.2d 1435 (9th Cir.1989). Mere negligence is

REPORT AND RECOMMENDATION - 11

insufficient to invoke the protections of the Fourteenth Amendment's due process clause. <u>Daniels v. Williams</u>, 474 U.S. 327 (1986) (overruling <u>Parratt v. Taylor</u>, 451 U.S. 527 (1981)).  Plaintiff has failed to show the incidents are anything other than negligence.  Indeed, grievance responses show the defendants have a reasonable policy in place and the grievance responses also show the defendants counseling staff to follow that policy.  The plaintiff has failed to show any adverse action to any litigation, admits the majority of his legal mail is properly handled, and he has no cause of action for the legal mail incidents.  Defendants are entitled to summary judgment on this issue.  This cause of action should be **DISMISSED WITH PREJUDICE.**

D. <u>Medical Emergency</u>.

The government has an obligation to provide adequate medical care for prisoners, and the Eighth Amendment proscribes deliberate indifference to their serious medical needs. <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976),  Such conduct is actionable under 42 U.S.C. § 1983.  <u>McGuckin v. Smith</u>, 974 F.2d 1050, 1059 (9th Cir. 1992).

In order to establish deliberate indifference there must first be a purposeful act or failure to act on the part of the defendant.  <u>McGuckin</u>, at 1060.  Here, there are factual disputes which preclude summary judgment.  The first dispute is whether plaintiff declared a medical emergency.  In the affidavit in support of his motion for summary judgment defendant Thaut indicates plaintiff did not declare a medical emergency.  (Dkt. # 56, Exhibit 4).  In the answers to interrogatories defendant Thaut indicates plaintiff did declare a medical emergency and that medical personnel were contacted.  (Dkt. # 97, Attachment II, Exhibit E, Second Exhibit numbered 1).  Plaintiff also has an affidavit from another inmate indicating plaintiff did declare an medical emergency.  This issue needs to be decided by a finder of fact.

The second issue is whether medical personnel were in fact contacted and if they were what was there response. Prison officials violate the Eighth Amendment when they purposefully deny, delay or interfere with medical treatment.  When inmates are exposed to second hand pepper spray prison officials have a duty to insure they receive treatment for a condition that could be serious or could cause wanton infliction of pain.  <u>Clement v. Gomez</u>, 298 F. 3rd 898 (9th Cir. 2002).  Plaintiff

REPORT AND RECOMMENDATION - 12

alleges he vomited blood and had stomach pain on January 1st, 2004 and was denied medical treatment for that pain.

In light of the Ninth Circuit opinion in <u>Clement v. Gomez</u>, 298 F. 3rd 898 (9th Cir. 2002) this court cannot grant summary judgment on this issue. In <u>Clements</u>, inmates were indisputably exposed to second hand pepper spray.  The court found a serious medical need is one which if left untreated could result in significant injury or wanton infliction of pain.  Plaintiff's condition, and defendant Thaut's state of mind on January 1st, 2004 are at issue.  The court should **DENY** summary judgment on this issue.

E.    Medical Treatment.

Separate from the issue of whether plaintiff declared a medical emergency is the adequacy of medical treatment given to the plaintiff.  A difference of opinion between a prisoner and medical authorities regarding proper medical treatment does not give rise to a section 1983 claim.  <u>Franklin v. Oregon, State Welfare Div</u>., 662 F.2d 1337, 1344 (9th Cir. 1981).  Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights. <u>Hutchinson v. United States</u>, 838 F.2d 390, 394 (9th Cir. 1988). Finally, a prisoner can make no claim for deliberate medical indifference unless the denial was harmful.  <u>McGuckin</u>, at 1060; <u>Shapely v. Nevada Bd. of State Prison Comm'rs</u>, 766 F.2d 404, 407 (9th Cir. 1985).

Here, plaintiff made a request to have throat lozenges on January 4th, 2004, He did not request to be seen. (Dkt. # 97, Attachment I, Appendix E, Exhibit 1).  He then asked a hypothetical question on January 7th, 2004.  Again he did not ask to be seen. (Dkt. # 97, Attachment I, Appendix E, Exhibit 2).  Finally, on January 11th, he requested to be seen but did not indicate his condition was life threatening or serious. Plaintiff makes no mention of the January 1st pepper spray incident and instead indicates he has a "Hieital [sic] Hernia", that he "often" regurgitates food and has an irritated esophagus.  He also indicates he vomits or coughs causing stomach pain. (Dkt. # 97, Attachment I, Appendix E, Exhibit 3). Plaintiff was seen by PA Figueroa two days later.

Over the next several months plaintiff makes multiple requests and is seen a number of times. Prison medical staff never refused him treatment and they provided treatment that gave plaintiff some

REPORT AND RECOMMENDATION - 13

relief.  Finally in May of 2004 a full evaluation by Doctor Khurshid discloses  plaintiff does not have a hernia or if he does it is small and not the cause of his symptoms.  The vomiting of blood on January 1st, 2004 was caused by the coughing and dry heaves and was a result of second hand exposure to pepper spray, but, there is no documentation to show there was actually vomiting of blood, and while prison officials are prepared to give barium exams and an EGD an EGD is not medically indicated at this point in time.  (Dkt. # 97, Attachment I, Appendix E, Exhibit 10).  Plaintiff is not allergic to pepper spray.  Plaintiff has not shown any injury as a result of failure to treat and has failed to come forward with any evidence to show medical providers were in any way indifferent to his condition.  The defendants are entitled to summary judgment on the issue on medical treatment.  This issue should be **DISMISSED WITH PREJUDICE.**

   F.  <u>Conditions of confinement</u>.

  At trial plaintiff would bear the burden of proving a causal connection between the lighting in the IMU unit and his failing eyesight or his alleged mental condition.  He has come forward with no evidence connecting his change in prescription or his alleged mental problem to his environment.  Further, defendants have placed before the court valid and weighty security concerns to justify the constant low level illumination and other conditions of confinement.  (Dkt. # 56, page7).  They have also averred the translucent widows allow light to enter but prevent inmates in the IMU from contacting inmates on the outside.  Plaintiff has not challenged this assertion in any meaningful manner.

  Plaintiff's pleadings on these issues are conclusory and unsupported at best.  (Dkt. # 97, pages 4, 18 to 21).  There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt.").  <u>See also</u> Fed. R. Civ. P. 56 (e).

  Plaintiff has failed to come forward with any evidence to support his allegations of physical and mental injury and the defendant's are entitled to summary judgment on the conditions of confinement issue.  This issue should be **DISMISSED WITH PREJUDICE.**

REPORT AND RECOMMENDATION - 14

CONCLUSION

For the reasons stated above the undersigned recommends defendants motion for summary judgement be **GRANTED IN PART AND DENIED IN PART**. A proposed order and proposed order accompanies this Report and Recommendation.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985). Accommodating the time limit imposed by Rule 72(b), the clerk is directed to set the matter for consideration on **August 12th 2005**, as noted in the caption.

DATED this 13th day of July, 2005.

*/S/ J. Kelley Arnold*
J. Kelley Arnold
United States Magistrate Judge

REPORT AND RECOMMENDATION - 15